### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA,
ex rel. NOREEN LANAHAN,

               Relator,

      v.

COUNY OF COOK,

            Defendant.

Case No. 17 C 5829

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Defendant Cook County moves to dismiss Relator's Amended Complaint pursuant to FED. R. CIV. P. 12(b)(6) and FED. R. CIV. P. 9(b). (Dkt. No. 52.) For the reasons stated herein, the Court grants the motion. The Court dismisses Relator's Amended Complaint without prejudice. Relator may file a Second Amended Complaint within thirty (30) days. If no Second Amended Complaint is filed, this dismissal without prejudice will convert to one with prejudice.

## I.  BACKGROUND

This case arises from an alleged scheme by Cook County (the "County") to defraud the United States of federal grant funds. Relator lodges a sprawling 294-paragraph Amended Complaint with six counts against the County. The first five counts allege the County violated the False Claims Act ("FCA"), specifically by: (1)

presenting and submitting false claims in violation of 31 U.S.C. §§ 3729(a)(1)(A) & (B) (Counts One and Two); (2) retaining and converting federal funds premised on false claims in violation of 31 U.S.C. §§ 3729(a)(1)(D) & (G) (Counts Four and Five); and (3) conspiracy to violate the FCA in violation of 31 U.S.C. § 3729(a)(1)(C) (Count Three). Count Six alleges the County violated the FCA when it violated two other federal statutes, the Stark Law and Anti-Kickback Statute. *See* 42 U.S.C. § 1320a-7b(b); 41 U.S.C. § 1395nn.

The Court summarizes Relator's claims but notes the Amended Complaint was difficult to follow and rife with inconsistencies. Nevertheless, the Court takes the following facts therefrom. The Court construes the facts in the light most favorable to the Relator, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in Relator's favor. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

### A. Relator's Examples

Relator, Noreen Lanahan ("Relator"), worked as a Director of Financial Control for the County's Department of Public Health ("CCDPH"). (Am. Compl. ¶¶ 16 & 27, Dkt. No. 42.) In that position, Relator alleges she supervised the County's grant fund accounting, including the submission of claims for payment to the Government in connection with federal public health grants. (*See id.* ¶¶ 27

& 243.) Although Relator alleges she is an "original source" of the information pleaded in the Amended Complaint, she does not plead the details necessary to allege FCA violations or even the dates of her employment. (*Id.*) Instead, the Amended Complaint alleges six examples of apparent FCA violations during the "relevant time period." (*See, e.g.*, *id.* ¶¶ 5, 16, 64, 75–77, 81, 109–10, 136, 138, 140, 149–50, 155, 159, 227–28, & 231–32.) For each example, the Court details the allegations as follows.

### 1. $2.5 Million H1N1 Personal Service Costs Reimbursement and Transfer

Generally, Relator alleges that County certifications for federal grant awards "during the relevant period" "were expressly and impliedly false." (*Id.* ¶¶ 136–37.) According to Relator, this is because the County: (1) failed to maintain reliable records of employee time spent on federal programs; (2) manually adjusted certified cost reimbursement claims to align with the County's objective to spend down grant money; and (3) perpetuated an "ongoing scheme" to launder federal grant proceeds through the Cook County Health and Hospital System ("CCHHS") Enterprise Fund ("Enterprise Fund"). (*Id.* ¶¶ 115 & 138.) Relator also alleges the County's retention of proceeds from false claims submitted to the United States "impliedly compromised all of the certificates warranting awards and payments related to grants" during the

relevant period. (*Id.* ¶¶ 140–42.) In support, Relator provides the following example.

The Centers for Disease Control and Prevention ("CDC") awarded two grants to CCDPH in 2009 to combat H1N1, totaling $2.5 million. (*Id.* ¶ 90.) Under the terms, the United States supplied vaccines and reimbursed CCDPH for the personal service cost of delivering those vaccines to certain County residents. (*Id.* ¶ 92.) In general, CCDPH's ability to achieve grant deliverables depends on its ability to absorb liabilities until it can submit claims for and obtain reimbursement from the United States. (*See id.* ¶ 244.) As the period of performance for the grants reached expiration, managers assigned employees usually staffed on local public health objectives to work on the federal grant deliverables. (*Id.* ¶ 93.) Yet, the payroll system continued to track and charge those employees as expenses to a general business account instead of the restricted business unit accounts specifically created for the H1N1 grants. (*Id.* ¶¶ 91–94.)

To determine what amount of money should be charged from the restricted accounts, the H1N1 program manager then requested the payroll records of over one hundred employees to review their time charges during the period of performance. (*Id.* ¶ 96.) She used those records to estimate the employees' time spent on the H1N1 grants. According to Relator, the resulting "estimate" was not in

proportion to the time spent on the H1N1 initiative. Instead, the H1N1 program manager "applied an arbitrary percentage to the salary expensed to local taxpayers to arrive at a value closely aligned with spending down the balance" of the H1N1 grant awards. (*Id.* ¶¶ 95–99; *see also* Invoices, Am. Compl., Exs. 1 & 2, Dkt. No. 42-1 & 42-2.) Those amounts were then "manually adjusted a second time to accommodate travel expenses." (Am. Compl. ¶ 99.)

The County allegedly certified claims and submitted them to the CDC that listed a personal service cost of $1,210,802.33 on the first restricted business unit account plus $46,856.23 in travel expenses, totaling $1,257,658.56. (*Id.*) The County also allegedly certified and submitted the identical employees at a personal service cost of $1,065,506.05 on the second restricted business unit account plus $93,600 in travel expenses, totaling $1,159,106.05. (*Id.*) The claims submitted on both accounts total $2,416,764.61, suspiciously close to the total $2.5 million allotment. (*Id.*) Relator alleges the CDC reimbursed the County for these amounts. (*Id.* ¶ 106.) But the personal service costs certified, submitted, and reimbursed did not reflect the County's liabilities actually incurred to support the H1N1 grant objectives. (*Id.* ¶ 100.)

Relator next alleges that, after the period of performance for a grant ends, regulations require the County to adhere to

certain closeout procedures—the objective being to reconcile revenue with expenses. (*Id.* ¶ 101.) Specifically, the regulations require "liquidation of all obligations under the grant within 90 days of the end of the performance period" and the return of all unliquidated grant money to the United States. (*Id.* ¶ 102.) The County delegates the responsibility of balancing its various fund accounts, in compliance with applicable laws and regulations, to the Comptroller. (*Id.* ¶¶ 103–04.) The County code prohibits the Comptroller "from liquidating the balance of federal reimbursement funds credited to restricted grant business unit accounts" and requires the Comptroller "to balance and close all revenue accounts by . . . November 30th." (*Id.* ¶ 105.)

In September 2011, the County generated vouchers for the H1N1 grant reimbursements. (*Id.* ¶ 108.) The vouchers labeled the reimbursement payments as employee costs incurred on behalf of the grants, and the Comptroller directed staff to voucher these reimbursement payments as credits to a specific account. (*Id.* ¶¶ 109–10; *see also* Reimbursement Vouchers, Am. Compl., Exs. 3 & 4, Dkt. Nos. 42-3 & 42-4.) Per grant closeout procedures, these unliquidated H1N1 reimbursement funds were owed back to the United States, and "the Comptroller was bound to close the grant business units and refund the payments to the United States." (Am. Compl. ¶¶ 111–12.) Instead, in October 2011, "the Comptroller liquidated

$1,237,451[.]41 and $1,257,658.56 from the restricted H1N1 grants to . . . a "special revenue fund." (*Id.* ¶¶ 113–14.) The County then adopted these amounts from its corporate balance sheet to the CCHHS Enterprise Fund. (*Id.* ¶ 115.)

Relator alleges that neither the County nor the CCHHS Enterprise Fund recorded the liquidated funds as a liability owed to the United States. (*Id.* ¶ 116.) The County uses cost accounting standards, recognizing "revenue and expenses only at the time when cash changes hands." (*Id.* ¶ 117.) CCHHS uses accrual accounting standards, recognizing "revenue when it is earned and expenses at the time that they are billed." (*Id.*) Because of the differing accounting standards, "the Comptroller is not legally bound to balance CCHHS revenue accounts at the close of [the] County's fiscal year." (*Id.*) Therefore, Relator alleges that the transfer of grant funds to the CCHHS Enterprise Fund allowed the County to circumvent "external and internal financial and accounting standards that would have otherwise triggered a refund to the United States." (*Id.* ¶ 118.)

### 2. $6.8 Million Personal Service Costs Inquiry and Transfer

Relator alleges the County used the CCHHS Enterprise Fund "to launder the illicit proceeds from false claims paid by the United States for grants . . . by applying the funds as profit to CCHHS" and that this practice "applied to all cost reimbursement grants

administered by [CCDPH] during Relator's tenure." (*Id.* ¶ 120.)
Between 2007 and 2017, CCDPH "oversaw approximately $100 million
in grants awarded" to advance federal grant objectives in the
County suburbs. (*Id.* ¶ 121.) Thus, Relator alleges that the County
"retained tens of millions of dollars in reimbursements from the
United States for personal service costs that were not incurred"
in support of federal grant objectives. (*Id.* ¶ 122.)

Relator alleges that she "became aware [of] and increasingly
concerned about" the County's administration of federal grant
funds in 2014. (*Id.* ¶ 124.) Specifically, near the end of the 2014
fiscal year, Relator received an inquiry from "County executives"
about $6.8 million in grant revenue that remained on CCDPH's
"balance sheet at the time of a recent external audit." (*Id.* ¶¶ 125
& 127; *see also* Nov. 2014 Email Chain, Am. Compl. Ex. 5, Dkt.
No. 42-5.) Relator responded that the money related to personal
service costs charged to specific grants from the United States,
and she identified four restricted business unit account numbers
that corresponded with the grants. (Am. Compl. ¶ 127.) "She
explained that the collective balance reflected deferred revenue
carried forward from 2013 grants that would be adjusted at grant
closing." (*Id.* ¶ 128.) Relator does not allege that the County
failed to perform the personal services charged to these four
restricted business unit accounts.

On November 10, 2014, the CCHHS Vice Chairman approved an internal recommendation to liquidate the $6.8 million and absorb the federal grant money as revenue to CCHHS. (*Id.* ¶ 129.) The recommendation "ordered preparation of vouchers liquidating the restricted cash credited to the grant business units to the CCHHS Enterprise Fund as profit." (*Id.*) The absorption of these funds directly as profit to the Enterprise Fund cannot be traced by audit trail. (*Id.* ¶¶ 131-32.)

This concerned Relator, and she expressed her frustrations about the liquidation in an email to the CCHHS Chief Financial Officer ("CFO"). (*Id.* ¶ 133.) In that email, Relator stated that commingling federal grant funds and local revenue to "prop-up" the CCHHS Enterprise Fund amounted to a "stunning" indifference to accounting principles. (*Id.; see also* Lanahan Email to CCHHS CFO, Am. Compl., Ex. 6, Dkt. No. 42-6.) Relator likened the action to "Enron management and accounting." (Am. Compl. ¶ 133; Lanahan Email to CCHHS CFO.)

### 3. $14 Million Delegated to the Public Health Institute of Metropolitan Chicago ("PHIMC")

In March 2010, Relator learned that CCDPH had received a $16 million grant award from the CDC. (Am. Compl. ¶¶ 241 & 243.) Only certified public health departments were eligible for this funding. (*Id.* ¶ 242.) CCDPH is a certified public health department. (*Id.* ¶ 239.) Unlike the grants in Relator's first two

- 9 -

examples, the CDC advanced the money upfront. (*Id.* ¶ 244.) This meant that the County did not have to absorb liabilities until it submitted and obtained reimbursement from the United States. (*Id.*)

In 2011, Relator learned that the CCHHS Board prepared an agreement with PHIMC to serve as fiscal agent for these funds. (*Id.* ¶ 245.) PHIMC is not a certified public health department nor did it have any agreement with the County—the guarantor for the funds. (*Id.* ¶ 246.) Relator alleges that PHIMC lacked the resources and financial controls to qualify for the award independently. (*Id.* ¶ 247.) For this reason, the transfer of funds concerned Relator. (*Id.* ¶ 249.) Relator was also concerned because "the CCHHS Board lacked the authority to transfer funds awarded to [CCDPH] without the approval of the [ ] County Board of Commissioners," and CCDPH would have to account for the funds in its annual audit. (*Id.* ¶¶ 248–50.)

The CCHHS Board approved "a memorandum of understanding for PHIMC to act as fiscal agent" for the funds. (*Id.* ¶ 251.) Because of her concerns, Relator refused to transfer the funds to PHIMC without authorization from the County Board of Commissioners. (*Id.* ¶ 252.) Then, CCDPH counsel informed Relator that PHIMC had already received the funding. (*Id.* ¶ 253.) Despite the funding have already been transferred, the CCDPH counsel asked whether Relator intended to include approval of the transfer on the County Board of

Commissioners agenda. (*Id.* ¶ 254.) Ultimately, the County Board of Commissioners approved the transfer. (*Id.* ¶ 255.)

During the annual audit, Relator conveyed her concerns about this transfer to auditors. (*Id.* ¶ 256.) The auditors advised her to put her concerns in writing and send them to the County CFO and Chief Budget Officer. (*Id.* ¶ 257.) Relator did what the auditors advised her to do. (*Id.* ¶ 258.) The only response Relator received was from a County Budget Office employee informing her that "her written concerns were not welcome." (*Id.*)

### 4. Hektoen Kickback Scheme

Next, Relator alleges that the County and the Hektoen Institute of Medicine ("Hektoen") participated in a kickback scheme involving federal grant funds. Hektoen "is an Illinois non-profit organization that operates as a fiscal agent for public grants." (*Id.* ¶ 163.) Since "at least the 1970s," Hektoen has operated as a fiscal administrator for grants awarded to County hospitals, including John Stroger Hospital ("JSH") and Provident Community Hospital ("PCH"). (*Id.*) "In exchange for an administration fee, Hektoen promotes itself . . . as a turnkey solution for the fiscal administration of public grants." (*Id.*)

Relator alleges familiarity with Hektoen from her work in the healthcare industry, the news, and from personal experience in her role as Director of Financial Control. (*Id.* ¶¶ 164–66.) As for the

scheme, Relator alleges that Hektoen provided kickbacks to physicians charged with federal grants oversight as a reward for selecting Hektoen to administer those grants. (*Id.* ¶¶ 231-32.) In exchange, Relator alleges the physicians, in addition to the administration fee, permitted Hektoen "to skim" off a percentage of the federal award. (*Id.* ¶¶ 186-87 & 291.) "On information and belief," this percentage went into a "Dean's Fund" that "department chairs and senior physician leadership" utilized "for parties, travel, and other unallowable costs." (*Id.* ¶ 188.)

Relator alleges the arrangement with Hektoen to administer grant funds gives the physicians that contract with Hektoen "complete discretion" over the remaining percentage of funds after the "Dean's Fund" allocation. (*Id.* ¶¶ 189 & 193.) Before turning over control, however, Hektoen requires authorization from the physicians' "fiscal and clinical chain of command within [the] County's health network." (*Id.* ¶ 193.) To obtain this authorization, physicians must create a budget outline of their plans for the discretionary funds, and that budget outline must be "approved and authorized by CCHHS officials." (*Id.*) Once authorized, Hektoen transfers the funds from the grant account to the principal investigator's discretionary account. (*Id.* ¶ 194.) After this, Relator alleges that there is no additional oversight. (*Id.*)

Relator alleges additional benefits to physicians for contracting with Hektoen. For example, physicians have substantial discretion over hiring employees with minimal interference from Hektoen. (*Id.* ¶ 190.) Relator notes that "Hektoen does not prohibit staffing grants with relatives and acquaintances." (*Id.*) Also, to make grant-related contract purchases, physicians submit a form to Hektoen, and Hektoen uses grant funds to make the purchase without additional "scrutiny" or "public oversight." (*Id.* ¶ 191.) Finally, many CCHHS "physicians were compensated at a rate higher than the permissible rate chargeable as a salary expense" to federal grants and CCHHS "internally tracked credits awarded to physicians for delegating the fiscal management" of awards to Hektoen. (*Id.* ¶ 196; *see also* Physician Grant Time Tracking Ledger 9/1/2013 to 10/31/2014, Am. Compl., Ex. 9, Dkt. No. 42-9.)

### 5. Dr. Bala Hota

Relator alleges that at least one former JSH physician, Dr. Bala Hota, received cash benefits in exchange for Hektoen's fiscal management of a federal grant. (Am. Compl. ¶¶ 198–203 & 211–21.) Relator relays many details about Hota's alleged theft of funds from an April 2018 *Chicago Tribune* investigation and article. (*See id.; see also id.* ¶ 218 n.11.) The article indicates that, over a period of several years, Hota stole nearly $250,000 in grant revenue for personal expenses like electronics and luxury travel.

(*See id.* ¶¶ 198–203 & 211–21.) Relator alleges that she is unaware of any attempts to disclose this theft to the United States. (*Id.* ¶ 204.)

### 6. Cost Reports

Finally, Relator alleges the County certified JSH and PCH cost reports to the Centers for Medicare and Medicaid Services ("CMS") that were false. The United States prepays reimbursements to JSH and PCH based on cost reports certified to CMS for patient care services covered by Medicare and Medicaid. (*Id.* ¶¶ 59 & 155–57.) To determine the prepayment, CMS requires hospitals to account for all patient care cost contributions in the cost reports, including "any public grant revenue donated in support of patient care services." (*Id.* ¶ 158.) Relator alleges that, "during the relevant period," the County "falsely certified" CMS cost reports by omitting grant revenue managed by Hektoen on the County's behalf, failing to disclose fraud, and certifying compliance with applicable federal and state laws, regulations, and ordinances. (*Id.* ¶¶ 159–60, 197, 225–30.) Relator also alleges that the County duplicates its return on personal service costs by expensing them to federal grant reimbursements and in CMS cost reports. (*Id.* ¶ 176.)

In support of these allegations, Relator cites the following language allegedly from the preface and certification portion of

cost reports submitted by County officials from both hospitals to CMS "[s]ince at least 2008":

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.
>
> CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)
>
> I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by _____{Provider Name(s) and Number(s)}for the cost reporting period beginning _____ and ending _____ and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

(*Id.* ¶¶ 225–26.) Relator also makes two general allegations about JSH's 2018 cost report. First, Relator alleges that JSH claimed $516,396,057 for reimbursement from CMS for personal service costs like salary and wage expenses. (*Id.* ¶ 157.) Second, Relator alleges that JSH's CFO endorsed the CMS cost report. (*Id.* ¶ 160.)

### B. Procedural Posture

Relator filed her Complaint on August 10, 2017. After the United States declined to intervene in the action, the case was reassigned to this Court. On May 26, 2020, Relator filed her First Amended Complaint. On September 14, 2020, the County filed this motion to dismiss. (Mot., Dkt. No. 52.)

## II. **LEGAL STANDARD**

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint. To survive a Rule 12(b)(6) motion, the complaint's allegations must meet a standard of "plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 676 (7th Cir. 2016) (quotation and citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### III. **DISCUSSION**

Under the FCA, private individuals known as relators may file *qui tam* civil actions against alleged fraudsters on behalf of the United States government. *United States ex rel. Watson v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013); 31 U.S.C. § 3730. If the Government does not intervene in the action, as here, a relator may proceed with the action solo but still on the Government's behalf. 31 U.S.C. § 3730(c)(3). If successful, a relator is eligible to receive a percentage of the total recovery. *Id.* § 3730(d)(1)–(2).

### A. **Rule 9(b) Particularity Pleading**

Because the FCA is an anti-fraud statute, Relator must meet the heightened pleading requirements of Rule 9(b). *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). Rule 9(b) requires that a plaintiff "alleging fraud or mistake . . . state with particularity the circumstances constituting fraud or mistake," meaning "the who, what, when, where, and how" of the fraud or "the first paragraph of any newspaper story." FED. R. CIV. P. 9(b); *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) (internal quotations omitted). "That includes the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation

- 17 -

was communicated to the [Government]." *United States ex rel. Hanna v. City of Chi.*, 834 F.3d 775, 779 (7th Cir. 2016) (citation and quotation omitted).

Rule 9(b) has three main purposes: (1) to protect a defendant's reputation from harm; (2) to minimize "strike suits" and "fishing expeditions"; and (3) to provide adequate notice of the claim to a defendant. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (citation omitted); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011) ("As one district court has noted, the particularity requirement of Rule 9(b) is designed to discourage a 'sue first, ask questions later' philosophy."). "Courts have generally agreed that when a relator pleads lengthy fraudulent schemes, the relator need only allege representative examples of the fraud with particularity." *United States v. Addus HomeCare Corp.*, No. 13 CV 9059, 2017 WL 467673, at *10 (N.D. Ill. Feb. 3, 2017) (citing cases).

In her response, Relator cites to Eighth Circuit precedent to argue that she is a "*bona fide* whistleblower" entitled to a "relaxed" Rule 9(b) standard. (Resp. at 10-12 (citing *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914 (8th Cir. 2014)), Dkt. No. 55.) This is the first time Relator identifies herself as a whistleblower. Further, Relator does not

cite, nor can the Court find, any instance where the Seventh Circuit adopts this standard. While the Seventh Circuit has said that Rule 9(b)'s requirements are relaxed when the Relator lacks access to all facts necessary to detail her claim, Relator does not allege that here. *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998). Indeed, Relator argues the opposite, insisting that she is a "quintessential whistleblower" with "insider status." (Resp. at 10–12.) She claims direct and independent knowledge based on personal involvement in the federal grant compliance process and submission of claims for reimbursement. (*See id.*) This negates any potential lack of access argument.

Further, courts in this district have struggled to reconcile a relaxed pleading standard for *qui tam* relators with the fact that a *qui tam* relator acts on the government's behalf. *See, e.g.*, *United States v. Thorek Hosp. & Med. Ctr.*, No. 04 C 8034, 2007 WL 2484333, *2 (N.D. Ill. Aug. 29, 2007) (Andersen, J.) ("The *qui tam* relator must meet the normal standard of particularity required by Rule 9(b)."); *United States v. Ortho-McNeil Pharm., Inc.*, No. 03 C 8239, 2007 WL 2091185, *4 (N.D. Ill. July 20, 2007) (Kendall, J.) ("If a relator cannot plead with particularity alleged violations of the FCA, he stands in no better position to assist the Government than any other citizen."); *Peterson v. Cmty.*

*Gen. Hosp.*, No. 01 C 50356, 2003 WL 262515, at *2–3 (N.D. Ill. Feb. 7, 2003) (Reinhard, J.) ("[T]he whole point of relator's case is that defendants submitted [fraudulent] Medicare claims . . . But which patients? And which claims? And which claims or other documents show defendants falsely certified their compliance with federal law? These questions are absolutely essential to relator's claim of fraud."). Some have even concluded that relaxing the Rule 9(b) pleading standard should be limited to "rare circumstances" because it "would undermine the purposes of fraud pleading generally and the FCA specifically." *Ortho-McNeil Pharm., Inc.*, 2007 WL 2091185, at *4. Because Relator has not alleged circumstances warranting exception, Relator must meet Rule 9(b)'s particularity pleading requirements.

To satisfy Rule 9(b), Relator must allege the who, what, when, where, and how of the alleged fraud. Put another way, Relator must plead "specific facts demonstrating what occurred at the individualized transactional level." *Berkowitz*, 896 F.3d at 841. Despite alleging a broad scheme by the County to defraud the United States, none of Relator's proffered examples pleads the necessary underlying details of that fraud scheme. Tellingly, Relator does not refer the Court to specific allegations in her response when challenged on her lack of "newspaper story" details of each example. *Lusby*, 570 F.3d at 853. Relator instead resorts to

sweeping statements. (*See, e.g.*, Resp. at 7 (stating each example "provides the requisite 'who, what, where, when and how.'").) Sweeping statements, however, are not enough.

The FCA imposes liability on any person who:

**(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

**(C)** conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

**(D)** has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

. . .

**(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

31 U.S.C. § 3729(a)(1). Relator alleges violations of all the listed § 3729(a)(1) subsections.

To maintain a claim under any of these subsections, Relator must, at a minimum, allege the submission of a false statement to the Government for payment. *See Mason v. Medline Indus., Inc.*, No. CIV.A. 07 C 5615, 2009 WL 1438096, at *4 (N.D. Ill. May 2009) ("The *sine qua non* of a False Claims Act violation is the

submission of a fraudulent claim."); *see also Hanna*, 834 F.3d at 778 (stating that to prove a § 3729(a)(1)(A), a relator must show that: (1) the defendant made a statement to receive money or property from the government; (2) the statement was false; and (3) the defendant knew the statement was false); *United States ex rel. Marshall v. Woodward Inc.*, 812 F.3d 556, 561 (7th Cir. 2015) (stating to prove a § 3729(a)(1)(B) violation, a relator must show that: (1) the defendant made a statement or record in order to receive money or property from the government; (2) the statement or record was false; (3) the defendant knew the statement or record was false; and (4) the false statement or record was material to the government's decision to pay or approve the false claim). Part of meeting that minimum includes pleading the particularities of the false statement in accordance with Rule 9(b).

Relator does not plead the submission of a false statement to the Government for payment at all, let alone with the kind of particularity that Rule 9(b) demands. Thus, Relator does not meet the minimum. The Court addresses the two most obvious deficiencies in Rule 9(b) terms—the when and the what.

### 1. The When

The Amended Complaint does not allege specific dates. Instead, it repeatedly references the "relevant period." (*See, e.g.*, Am. Compl. ¶¶ 5, 16, 64, 75–77, 81, 109–10, 136, 138, 140,

149–50, 155, 159, 227–28, & 231–32.) Relator makes her allegations as an "original source," but the Amended Complaint does not allege the dates of her employment. Further, the Amended Complaint does not allege a single date when the County made any allegedly false statement to the Government for payment. The Court does not expect Relator to allege an exact date for every allegation, but alleging none falls far short of Rule 9(b)'s requirements.

When the Amended Complaint does mention dates, most pertain to alleged activity *after* payments were already disbursed to County accounts. Such allegations say nothing about when and how the County made a false statement to the Government for payment. Nor do they establish when and how the County got the money for any given grant. With an alleged complex scheme that seemingly spans from 2008 to the present, it would certainly help to know when the *sine qua non* of an FCA violation took place. (*See* Am. Compl. ¶¶ 223 & 226.) *Mason*, 2009 WL 1438096, at *4. Absent allegations of a false statement to the Government for payment, subsequent allegations about the County's poor financing practices are meaningless for FCA purposes.

The when is also necessary to determine whether Relator's claims fall within the FCA's statute of limitations. The County argues the statute of limitations excludes allegations of violations before August 10, 2011. Nevertheless, the Court

- 23 -

declines the County's suggestion to dismiss on this basis. First, "[a] contention that the statute of limitations bars an action is an affirmative defense, meaning that the plaintiff is not required to negate it in its complaint." *United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1007 (N.D. Ill. 2001) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Second, the Amended Complaint does not allege facts sufficient for the Court to determine when any false statement was made to the Government for payment. The allegations do not even allow the Court to determine when violations may have occurred or the applicability of tolling. The Amended Complaint's allegations are simply too deficient to allow the Court to conduct a statute of limitations analysis.

### 2. The What

Relator must plead that the County submitted a false statement to the Government for payment either in the form of a claim or false certification of compliance. The Amended Complaint is devoid of either type of allegation. Relator argues that she alleges six examples, but "the number of examples does not compensate for their lack of particularity." *Mason*, 2009 WL 1438096, at *3.

First, as to false claims for payment, Relator does not allege any claim for payment submitted to the Government. For instance, in her second example, Relator alleges the details of a November 2014 email chain wherein the CCHHS Vice Chairman approved a

recommendation to transfer the $6.8 million balance of four grant-specific restricted business accounts as revenue to the CCHHS Enterprise Fund. (Am. Compl. ¶¶ 123–33.) Relator argues that a statement in the email chain directing staff members to move the money from the grant-specific restricted business accounts to the CCHHS Enterprise Fund constitutes a claim for payment. (*See* Nov. 2014 Email Chain, Am. Compl. Ex. 5 ("Please see decision below. We will be moving the $6.8 million to the Health fund. Please prepare the entries. Thanks.").) "Just like that," Relator concludes the "County violated the [FCA]." (Resp. at 3.) This is not a claim for payment to the Government though. Any claim that resulted in payment must have happened at some time before this directive. Relator does not allege facts about that apparent submission, and the Court cannot infer that it actually happened.

As to this second example, the Amended Complaint is silent about how the $6.8 million in personal service costs were submitted for reimbursement, when such claims were submitted, who submitted those claims, to whom the claims were submitted, and for what amounts. The other example discussing personal service cost submissions, example one, also comes up short. In this example, Relator pleads the amounts allegedly submitted for reimbursement (see Am. Compl. ¶ 99) but does not plead any of the other crucial details. Relator's remaining four examples similarly fail to plead

the details of a false claim. Relator cannot "merely . . . describe a private scheme in detail but then . . . allege simply and without any stated reason for [her] belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *United States ex rel. Quinn. v. Omnicare Inc.*, 382 F.3d 432, 440 (3rd Cir. 2004) (internal quotation marks and citation omitted); *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("Some [allegations] come close[ ] to specific allegations of deceit but [the plaintiffs] fail to link them to any claim for payment."). Ultimately, Relator fails to plead any claim for payment.

Without any claim for payment, it follows that Relator also fails to plead the falsity of any such claim. Instead, she argues that "[a]ny truth to the claims was abruptly undermined when the Vice Chairman directed the conversion of the funds into profit for the 'Health system fund.'" (Resp. at 7.) FCA claims do not simply arise from accounting failures, improper procedure, or disregard for regulations. *See United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1107 (7th Cir. 2014) ("[I]t is not enough to allege, or even prove, that the [defendant] engaged in a practice that violated a federal regulation. Violating

a regulation is not synonymous with filing a false claim."). The Court declines to draw such unreasonable inferences.

Second, as to false certifications of compliance to the Government for payment, Relator alleges that the County made multiple false statements or omissions to receive money from the Government. A false certification theory may be the "basis for FCA lability when a defendant not only requests payment on a claim 'but also makes specific representations about the good or services provided' and 'the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.'" *Berkowitz*, 896 F.3d at 840-41 (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989, 2002 (2016)). The problem is that Relator does not allege the specifics of any false certification. The Amended Complaint contains only general allegations that the County failed to comply with federal grant requirements but nonetheless certified compliance with those requirements to receive payment from the Government. (*See, e.g.*, Am. Compl. ¶¶ 135-42.) Such general allegations, however, do not plead false certification on an individualized transactional level.

For instance, in Relator's third example, she alleges that CCDPH received a $16 million grant award for which it appointed a

local non-profit, PHIMC, to serve as fiscal agent. (*Id.* ¶¶ 241-45.) Relator alleges this was problematic because only certified public health departments were eligible for the funding. (*Id.* ¶ 242.) According to Relator, PHIMC is not a certified public health department nor does it have the resources and financial controls to qualify for the award itself. (*Id.* ¶¶ 246-47.) Yet, nowhere does Relator allege the County made a false certification on this basis to receive the $16 million. The Court also fails to see why a fiscal agent like PHIMC would need to qualify for the funding it merely manages. These allegations require a logical leap beyond what Rule 9(b) permits.

The FCA is not "an all-purpose antifraud statute . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health*, 136 S.Ct. at 2003 (citation and quotations omitted). Thus, compliance with Rule 9(b) is mandatory. As discussed, the Amended Complaint fails to plead the key element for any FCA claim—a false statement to the Government for payment. It also lacks the facts necessary to demonstrate what occurred for any given example on an individualized transactional level. For this reason, the Court dismisses Counts One, Two, Three, Four, and Five for failure to state a claim.

### B. Anti-Kickback Statute and Stark Law FCA Claims: Count Six

Count Six alleges FCA claims based on alleged violations of the Anti-Kickback Statute and Stark Law. The purpose of these laws is to ensure lawful patient referrals for federally funded medical services. Specifically, "[t]he Anti–Kickback Statute criminalizes the knowing and willful solicitation, receipt, offer, or payment of any remuneration for referring patients for care or services that the government may pay for, in whole or in part, through a federal health care program." *United States ex rel. Dolan v. Long Grove Manor, Inc.*, No. 10 C 368, 2014 WL 3583980, at *4 (N.D. Ill. July 18, 2014) (citing 42 U.S.C. § 1320a–7b). "The Stark Law similarly 'forbids federal reimbursement for services that stem from compensated referrals.'" *Dolan*, 2014 WL 3583980, at *4 (citing *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008)). "Neither statute provides a right of private enforcement, but falsely certifying compliance with either is actionable under the FCA." *Dolan*, 2014 WL 3583980, at *4. Where, as here, an FCA claim is premised on the violation of these laws, Relator must plead the underlying violation in compliance with Rule 9(b)'s particularity pleading requirements. *Id.*

Three of Relator's alleged examples touch on these claims. In Relator's fourth example, she alleges that the County and Hektoen improperly rewarded JSH and PCH physicians charged with grant

oversight for selecting Hektoen to serve as fiscal administrator for those grants. (Am. Compl. ¶¶ 161–97.) Specifically, Relator alleges the County and Hektoen promised physicians certain benefits, including discretion over 90% of reallocated federal grant funds and near total autonomy over personnel decisions. (*Id.* ¶¶ 192–94.) In Relator's fifth example, she cites to an April 2018 *Chicago Tribune* investigation and article about one specific JSH physician, Dr. Bala Hota, who allegedly benefitted from Hektoen kickbacks and stole funds for personal expenditures. (*Id.* ¶¶ 198–221.) In Relator's sixth example, she also alleges that JSH and PCH also benefitted from the alleged arrangement with Hektoen because the hospitals avoided mandatory disclosure of public grant revenue in cost reports submitted to CMS for Medicare and Medicaid reimbursements. (*Id.* ¶ 8.) According to Relator, the County "falsely certified" CMS cost reports by omitting grant revenue managed by Hektoen on the County's behalf, failing to disclose fraud, and certifying compliance with applicable federal and state laws, regulations, and ordinances. (*Id.* ¶¶ 226–30.) Based on these examples, Relator alleges the County is liable for Anti-Kickback and Stark Law violations under the FCA. (*Id.* ¶¶ 290–93.)

Relator alleges the County falsely certified compliance with the Anti-Kickback Statute and Stark Law in CMS cost reports, giving rise to an FCA violation. Contrary to Relator's allegation,

violations of the Anti-Kickback Statute and Stark Law are not *per se* FCA violations. (*See id.* ¶ 292.) *United States ex rel. Kroening v. Forest Pharms., Inc.*, 155 F. Supp. 3d 882, 890–91 (E.D. Wis. 2016). In fact, "[k]ickbacks are not actionable under the FCA unless someone submits claims to the government for payment based on those kickbacks." *United States ex. rel. Stop Ill. Mktg. Fraud, LLC v. Addus Homecare Corp.*, No. 13 C 9059, 2018 WL 1411124, at *6 (N.D. Ill. Mar. 21, 2018). While Relator "does not need to present, or even include allegations about, a specific document or bill that the defendants submitted to the Government," she must do more than generally allege the submission of claims. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 777 (7th Cir. 2016). Relator must plead some details sufficient to support an inference of false claims. *See Lusby*, 570 F.3d at 853–54.

For this reason, Count Six suffers the same fate as the other counts. Relator has not pleaded details sufficient to support such an inference because she has not pleaded the submission of any claim at all. Relator argues that she met this burden and points to her allegations in example six that JSH and PCH submitted cost reports to CMS for Medicare and Medicaid reimbursements. (Resp. at 14–15.) Relator argues that, from this, the Court can draw a reasonable inference that the personal service costs charged to

Hektoen-managed grants were duplicative of expenses charged in the hospitals' CMS cost reports. The Court, however, cannot draw such an inference from the allegations in Relator's Amended Complaint.

While CMS cost reports can constitute claims for payment submitted to the Government within the scope of the FCA, Relator does not plead the material details of any CMS cost report in particular. *Mason*, 2009 WL 1438096, at *3 (finding CMS cost reports can constitute claims for payment but finding allegations deficient under Rule 9(b)); *see United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856–57 (7th Cir. 2006) (finding failure to allege false claim is fatal); *see also Garst*, 328 F.3d at 378 (finding relator "does not come close to alleging fraud with particularity"). To sufficiently allege duplicate charges, Relator must first allege details about specific cost reports, including: the overall amount claimed in the cost report, what portion of that claimed amount was for personal service costs, when the cost report was submitted, who submitted the cost report, when the report was submitted, and what years the cost report covers. The Court would then require the same information about the specific Hektoen-managed grants that Relator alleges duplicate personal service costs already claimed in a corresponding cost report. These details would allow the Court to compare the cost reports with the Hektoen-managed grant reimbursements for any

given year and potentially infer duplication from that information. The Court cannot simply conclude that duplicate charges exist without a description of the claims actually submitted in cost reports and for Hektoen-managed grant reimbursements in any given year.

Relator includes just two allegations about a specific cost report—JSH's 2018 cost report—in her general background allegations to her sixth example. (*See* Am. Compl. ¶¶ 154-60.) First, Relator alleges that JSH claimed $516,396,057 for reimbursement from CMS for personal service costs like salary and wage expenses. (*Id.* ¶ 157.) Second, Relator alleges that JSH's CFO endorsed the CMS cost report. (*Id.* ¶ 160.) Relator, however, does not connect these general allegations to any wrongdoing.

For example, Relator does not plead the specifics of any corresponding Hektoen-managed grants overseen by any JSH physician in 2018. As a result, these two random allegations do not allow the Court to infer that the personal service costs charged to Hektoen-managed grants overseen by JSH physicians were duplicative of expenses that JSH charged to CMS in its 2018 cost report. *See Mason,* 2009 WL 1438096, at *4 (concluding that plaintiff "simply has not established the necessary links between a fraudulent scheme and a false claim"). Because the Court cannot compare JSH's Hektoen-managed grant reimbursements for personal service costs in

2018 with the amount JSH certified to CMS for personal service costs in its 2018 cost report, Relator's reasonable inference argument fails.

Relator pleads some specific information about former JSH physician, Dr. Bala Hota. (*See* Am. Compl. ¶¶ 198-204 & 211-21.) However, Relator pulls most of these allegations from an April 2018 *Chicago Tribune* article versus relying on her own personal knowledge. (*See id.* ¶ 218 n.11.) These allegations speak to the alleged falsity of the County's cost report certifications. They do not, however, fill the major void in this Amended Complaint— the failure to allege the submission of a false statement to the Government for payment. Accordingly, the Court dismisses Count Six for failure to state a claim.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court grants the County's motion to dismiss Relator's Amended Complaint without prejudice. (Dkt. No. 52.) Relator may file a Second Amended Complaint within thirty (30) days. If no Second Amended Complaint is filed, this dismissal without prejudice will convert to one with prejudice.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: 11/24/2020