IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,
*ex rel.* NOREEN LANAHAN,

              Plaintiff,

        v.

COUNTY OF COOK,

              Defendant.

Case No. 17 C 5829

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Defendant Cook County moves to dismiss Relator's second amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b). (Dkt. No. 61.) For the reasons stated herein, the Court grants the Motion and dismisses Relator's second amended complaint with prejudice.

## I.  BACKGROUND

This case arises from an alleged scheme by Cook County (the "County") to defraud the United States of federal grant funds. Following dismissal of her first amended complaint ("FAC"), Relator filed the second amended complaint ("SAC"), which narrowed her case to four alleged violations of the False Claims Act ("FCA"). Specifically, Relator alleges that the County violated the FCA by: (1) presenting and submitting false statements to the Government in violation of 31 U.S.C. §§ 3729(a)(1)(A) & (B) (Counts

One and Two) and (2) retaining and converting federal funds premised on false claims in violation of 31 U.S.C. §§ 3729(a)(1)(D) & (G) (Counts Three and Four).

The Court summarizes Relator's claims as limited to the allegations in the SAC. While the Relator clearly made an effort to streamline her allegations, like the FAC, the SAC was often difficult to follow and remained littered with inconsistencies and formatting errors. Nevertheless, the Court accepts as true all the extracted facts that follow from the SAC, in the light most favorable to the Relator, and draws all possible inferences in Relator's favor. *See Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir. 2008).

### A. Relator's Examples

Relator, Noreen Lanahan, worked for the County's Department of Public Health ("CCDPH") from 1994 until her retirement in 2017. (SAC at 6, Dkt. No. 58.) Relator alleges that during her tenure the County received approximately $20 million per year in federal grants supporting public health initiatives. (*Id.* at 7.) Most of the grants came in the form of reimbursements for expenses incurred by the County in service of federal public health priorities, including the salaries of CCDPH employees whose time was spent on federal projects. (*Id.*). According to Relator, the County

administration of these federal grants was divided into two workflows, the Program Component, and the Finance Component.

Relator led the Finance Component as CCDPH's Director of Financial Control. (*Id.* at 6.) Relator explains that she collaborated with the Program Component to "develop budgets that were certified to the United States in order to qualify for funding." (*Id.* at 10.) Relator also "oversaw the claim and reimbursement policies applied by the County to hundreds of federal grants." (*Id.*) Relator alleges that from 2008 to 2017 she "repeatedly warned local officials that the United States was reimbursing the County for labor expenses it had not incurred." (*Id.* at 6-7.)

The SAC alleges various examples of purported fraudulent reimbursements, which the Relator claims violated the FCA. (*See id.* at 8-27.) For each example, the Court details the allegations below.

### 1. *$2.5 Million H1N1 Personal Service Costs Reimbursement and Transfer*

Relator's first example alleges that certifications submitted to the Centers for Disease Control ("CDC") in connection with two federal H1N1 flu grants were false. (*Id.* at 8.) According to Relator, the certifications were false because the County: (1) failed to maintain contemporaneous records of employee time dedicated to federal grants; (2) manually adjusted certified cost

reimbursement claims to align with pre-performance grant budgets; and (3) moved restricted federal grant funds to a discretionary account held for the benefit of the Cook County Health and Hospital System ("CCHHS"). (*Id.* at 15.)

In September 2009 the CDC awarded the County two grants totaling $2.5 million to address the ongoing H1N1 flu pandemic. (*Id.* at 8-9.) Under the terms of the H1N1 grants, the United States supplied vaccines and reimbursed CCDPH for the personnel costs associated with administering the grant, including the salaries of health care providers delivering the vaccines to County residents. (*Id.* at 9.) Prior to performance under the grants, the County prepared budgets based on the anticipated personnel needs to meet the federal objectives. (*Id.* at 10.) According to Relator, the Program Component provided lists of job titles that would be dispatched the federal grant service, such as "Public Health Nurse IV." (*Id.*) The Finance Component, under Relator's direction, would then create a budget based on the base salary for each title, prorated based on the anticipated length of federal service. (*Id.*)

Post-performance, the County submitted to the Government the costs allocated to administration of the H1N1 grant. Pursuant to 2 C.F.R. § 200.405:

> A cost is allocable to a particular Federal award or other cost objective if the goods or services involved are chargeable or assignable to that Federal award or

cost objective in accordance with relative benefits received. This standard is met if the cost:

    (1)   Is incurred specifically for the Federal award;

    (2)   Benefits both the Federal award and other work of the non-Federal entity and can be distributed in proportions that may be approximated using reasonable methods; and

    (3)   Is necessary to the overall operation of the non-Federal entity and is assignable in part to the Federal award in accordance with the principles in this subpart.

2 C.F.R. § 200.405(a). Federal regulations further provide that compensation costs "must be based on records that accurately reflect the work performed" and, among other things, be "supported by a system of internal control which provides reasonable assurance that the charges are accurate, allowable, and properly allocated." *Id.* § 200.430(i). According to Relator, the County failed to track its employees' dedication to federal service. (SAC at 9.) Instead, Relator alleges, the County employees' time allocations for federal grants were "generated by program managers 18 months after the grant period of performance in anticipation of billing the United States for the federal services." (*Id.* at 12.)

Confusingly, Relator also explains that tracking employees' federal service was "just not part of the Finance Component's workflow" and that she "never discussed with other [CCDPH] managers how individual employees apportioned their time among various

federal and local services." (*Id.* at 11.) She alleges, however, that the allocations are false because she "never tracked her own dedication to federal services." (*Id.* at 12.)

According to Relator on September 1, 2011 the County electronically certified two Grant Allocation Cost Reports to the CDC, in connection with the H1N1 grants. (*Id.* at 10.) Relator alleges that the reports reflected the "pre-performance budget estimates" instead of the "actual time a particular employee devote to a specific grant." (*Id.* at 12.) Ultimately, Relator alleges that the CDC reimbursed the County in connection with the H1N1 grants on September 26, 2011. (*Id.* at 14.)

According to Relator, federal regulations required the County to keep federal reimbursement funds separated from unaffiliated County revenue. (*Id.* at 15.) Upon receipt of grant funds, the Finance Component was responsible for preparing credit vouchers. (*Id.* at 14–15.) The credit vouchers were submitted to the County's comptroller who would apply the federal reimbursements to the appropriate accounts in CCDPH's general ledger with any notations. (*Id.*) According to Relator, the credit vouchers for the H1N1 reimbursement were processed on October 6, 2011 and applied to the appropriate CCDPH account with the notation "(r)eimb to PH for vaccine program." (*Id.* at 15.) The notation, Relator explains, was to ensure that these restricted grant funds were not commingled

with unrestricted funds in violation of federal regulations. (*Id.*) According to Relator, however, on November 30, 2011, just before the close of the County's fiscal year, the County comptroller moved the H1N1 funds into a discretionary account for the benefit of CCHHS. (*Id.*) Relator alleges that moving the H1N1 funds "frustrated the allocations" in the September 1, 2011 report and "undermined any truth to budget and compliance certifications" submitted in connection with the H1N1 grants. (*Id.* at 16.)

### 2. *$6.8 Million Excess WIC Grant Funds*

The United States Department of Agriculture awards grants for Women, Infants, and Children ("WIC"), including Supplemental Nutrition Program ("SNAP") grants and Case Management grants. (*Id.* at 16–17.) SNAP and Case Management grants are awarded annually on July 1. (*Id.* at 17.) According to Relator, "due to deferred personnel-related costs (time due, fringe benefits and so forth), the individual WIC grant business units occasionally retained a positive balance as the fiscal year drew to a close." (*Id.*) These positive balances carried forward into the next fiscal year and according to Relator by July 2014 "the County accumulated close to $6.8 million in deferred" WIC grant credits. (*Id.*)

In July 2014, the County's Director of Grant Management emailed Relator and others regarding the accumulated $6.8 million in credits on CCDPH's balance sheet. (*Id.* at 17; WIC Funds Emails

at 4, SAC, Ex. 5, Dkt. No. 58-5.) Relator explained that the credits were federal grant funds and meant to "provide [] funding for Salaries and Fringe Benefits of grant employees should current grants not be renewed." (WIC Funds Emails at 4.) Relator advised that "these funds need to be segregated by the use of a unique Cost Center." (*Id.*) The email conversation on this topic resumed in November 2014 when County auditors were unable to reconcile the $6.8 million credit with any CCDPH expenses. (SAC at 18; WIC Funds Emails at 2.) On November 10, 2014, the CCHHS Vice Chairman approved an internal recommendation to liquidate the $6.8 million and absorb the WIC grant money as revenue to CCHHS. (SAC at 19; WIC Funds Emails at 1.) The recommendation was based on a presumption that CCHHS absorbed certain WIC grant-related expenses. (WIC Funds Emails at 1.)

Relator alleges that CCHHS incurred no expenses in connection with WIC grants. (SAC at 19.) Accordingly, Relator alleges that CCHHS's absorption of these funds violated federal regulations that mandate the "the segregation of restricted Government funds from revenue unaffiliated with the federal service." (*Id.*) Relator further alleges that she expressed her frustrations about the liquidation in an email to the CCHHS Vice Chairman and others. (*Id.*) In that email, Relator alleges that she stated that commingling federal grant funds and local revenue to "prop-up" the

CCHHS Enterprise Fund amounted to a "stunning" indifference to accounting principles. (*Id.*) According to Relator, she likened the action to "Enron accounting." (*Id.*)

### 3. Hektoen Kickback Scheme

Next, Relator alleges that the County and the Hektoen Institute of Medicine ("Hektoen") participated in a kickback scheme involving federal grant funds. Hektoen "provided a turnkey solution for the fiscal management of federal research grants awarded to physicians assigned to County hospitals." (*Id.* at 21.) Relator alleges that Hektoen is paid 10–15% of the grant award to "submit [] claims and collect [] revenue on the physicians' behalf." (*Id.*).

Relator first alleges that Hektoen maintained no formal agreement with the County or any County hospital. (*Id.*) Instead, according to Relator, Hektoen unofficially contracted directly with individual County physicians, using agreements known as "Exhibit A." (*Id.*) Relator alleges that by its terms, Exhibit A was "not binding without the express written consent of the CCHHS CFO and the chief financial officer of the physician's assigned County hospital." (*Id.* at 22.) Relator further alleges that the CCHHS grants manager obtained the necessary signatures from County officials in person and then sent the only copy of the executed Exhibit A agreements to Hektoen. (*Id.*) According to Relator,

permitting Hektoen to maintain the only copy of the Exhibit A agreements violated federal recordkeeping requirements. (*Id.*)

Relator also alleges that the arrangement with Hektoen posed bookkeeping problems for the County. Because there was no contract with the County, the Finance Component did not create accounts for the grant funds held by Hektoen. (*Id.*) To illustrate this issue, Relator explains that in 2015 a County employee was asked to prepare entries in the CCHHS general ledger for $5 million in restricted grant funds held by Hektoen. (*Id.* at 21.) The employee refused because there was "no place to convert the restricted funds." (*Id.* at 21, 23.) Later, the same employee allegedly expressed frustration regarding the Hektoen arrangement to the County CFO. (*Id.* at 23.)

Second, Relator alleges that Hektoen misappropriated the federal grant funds. According to Relator, the Exhibit A agreements reallocated 10% of each federal grant into a "Dean's Fund." (*Id.* at 21.) Relator further alleges the arrangement with Hektoen gave County physicians "near autonomy" over the remaining percentage of funds, including "a virtual rubber stamp for purchase orders of goods to further exhaust the restricted federal funds." (*Id.* at 22.) Relator thus concludes that Hektoen collected reimbursement from the federal government based on false claims submitted by physicians. (*Id.*)

#### 4. Dr. Bala Hota

Relator alleges that at least one former County hospital physician, Dr. Bala Hota, embezzled federal funds as a result of Hektoen's fiscal management of a federal grant. (*Id.* at 23–25.) Relator relays many details about Dr. Hota's alleged theft of funds from an April 2018 *Chicago Tribune* investigation and article. (*Id.*) The article indicates that, over a period of several years, Dr. Hota stole nearly $280,000 in grant revenue for personal expenses like electronics and luxury travel. (*Id.*) Relator alleges that she is unaware of any attempts to disclose this theft to the United States. (*Id.* at 25.)

#### 5. $15.9 Million Delegated to the Public Health Institute of Metropolitan Chicago

In 2010, Relator learned that CCDPH had received a $15.9 million grant award from the CDC. (*Id.*) Only certified public health departments were eligible for this funding. (*Id.*) CCDPH is a certified public health department. (*Id.*) Unlike the grants in Relator's prior examples, the CDC advanced the grant funds prior to performance. (*Id.*) This meant that the County did not have to absorb liabilities until it submitted and obtained reimbursement from the United States. (*Id.*)

In June 2010, Relator learned that the CCHHS Board approved an agreement with the Public Health Institute of Metropolitan Chicago ("PHIMC") to serve as fiscal agent for these funds. (*Id.*

at 26.) PHIMC is not a certified public health department nor did it have any agreement with the County—the guarantor for the funds. (*Id.*) Relator alleges that PHIMC lacked the resources and financial controls to qualify for the award independently. (*Id.*) For this reason, the transfer of funds concerned Relator. (*Id.*) Relator was also concerned because CCDPH would have to account for the funds in its annual audit. (*Id.*) Consequently, Relator alleges that she "refused to endorse the Health's System Board's PHIMC transfer without explicit authorization for the fund transfer from the Cook County Board of Commissioners." (*Id.*)

In June 2011, the CCHHS Board passed a resolution authorizing the transfer of the grant funds to PHIMC. (*Id.* at 27.) Sometime thereafter, Relator learned that by the time the resolution passed the funds has already been transferred to PHIMC. (*Id.*) Despite the funding have already been received by PHIMC, the CCDPH counsel asked whether Relator intended to include approval of the transfer on the CCCHHS Board agenda. (*Id.*)

Relator alleges that during the County's annual audit she conveyed her concerns about this transfer to auditors. (*Id.*) The auditors advised her to put her concerns in writing and send them to the County CFO and chief budget officer. (*Id.*) According to Relator, she did what the auditors advised her to do. (*Id.*) Relator further alleges that the only response she received was from a

County budget office employee informing her that "her written concerns were not welcome." (*Id.*)

## B.  Procedural Posture

Relator filed her original complaint on August 10, 2017. (Dkt. No. 1.) After the United States declined to intervene in the action, the case was reassigned to this Court. (Dkt. Nos. 11, 14.) On May 26, 2020, Relator filed the FAC. (Dkt. No. 42.) On November 24, 2020, the Court dismissed the FAC without prejudice. (Dkt. No. 57.) Relator filed the SAC on December 8, 2020. (Dkt. No. 58.) On January 5, 2021, the County filed this Motion to Dismiss the SAC. (Dkt. No. 61.)

## II.  **LEGAL STANDARD**

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint. To survive a Rule 12(b)(6) motion, the complaint's allegations must meet a standard of "plausibility." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "[T]he plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *W. Bend Mut. Ins. Co. v. Schumacher,* 844 F.3d 670, 676 (7th Cir. 2016) (quotation and citation omitted).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

The FCA is an anti-fraud statute and therefore subject to the heightened pleading requirements of Rule 9(b). *United States ex rel. Berkowitz v. Automation Aids, Inc.,* 896 F.3d 834, 839 (7th Cir. 2018). Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). To meet Rule 9's heightened pleading standard, Relator must allege "the who, what, when, where, and how" of the fraud like "the first paragraph of any newspaper story." *United States ex rel. Lusby v. Rolls-Royce Corp.,* 570 F.3d 849, 853 (7th Cir. 2009) (internal quotation marks omitted). Relator is required to plead each of her claims "at the individualized transaction level" including "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *United States ex rel. Fowler v. Caremark RX, L.L.C.,* 496 F.3d 730, 742 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907 (7th Cir. 2009); *United States ex rel. Hanna v. City of Chicago,* 834 F.3d 775, 779 (7 Cir. 2016) (internal quotation marks omitted).

### III.  DISCUSSION

The FCA imposes liability on any person who:

**(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

. . .

**(D)** has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

. . .

**(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1). Relator alleges violations of all the listed Section 3729(a)(1) subsections.

To survive a motion to dismiss, Relator must at minimum plead transaction-level details evidencing violations of each of the foregoing subsections. *See Caremark,* 496 F.3d at 742. In its order and opinion dismissing the FAC, the Court set forth a detailed explanation of the Rule 9 pleading standard, the necessary components of an FCA claim, and the deficiencies in the FAC. (Op., Dkt. No. 57.) Despite this guidance, Relator has not cured the deficiencies which warranted dismissal of the FAC. Specifically,

Relator has once again failed to set forth allegations evidencing violations of the FCA with the specificity required by Rule 9. For the reasons set out below, the SAC is dismissed with prejudice.

## A. False Submissions to the Government

Counts I and II both allege that the County made false statements to the government. Count I alleges the County submitted false claims to the Government in violation of Section 3279(a)(1)(A). To succeed on a claim under Section 3279(a)(1)(A), the Relator must allege with particularity that the County "(1) submitted a false or fraudulent claim; (2) to the government for payment or approval; and (3) knowing that it was false or fraudulent." *United States, ex rel. Besancon v. UChicago Argonne, LLC,* 2014 WL 4783056, at *3 (N.D. Ill. Sept. 24, 2014). Count II raises a claim under Section 3729(a)(1)(B). To state a claim under this subsection, Relator must allege that the County "(1) made a statement to receive money from the government; (2) the statement was false; and (3) defendant knew it was false." *Id.* Relator has failed to allege facts to support claims under Section 3279(a)(1) subsections (A) or (B).

Relator must, at a minimum, allege the submission of a false statement to the Government for payment. *See Mason v. Medline Indus., Inc.,* 2009 WL 1438096, at *4 (N.D. Ill. May 2009) ("The *sine qua non* of a False Claims Act violation is the

submission of a fraudulent claim.") Conclusory allegations are not enough. Rule 9 requires the allegations include "the who, what, when, where, and how" of the alleged falsity. *Rolls-Royce,* 570 F.3d at 853. Relator, however, fails to adequately plead any false statements, let alone statements made in connection with any government payments.

The Court first dismisses out of hand Relator's conclusory statements that the County was reimbursed for false claims. Relator alleges that County profited from the "reimbursement of WIC false claims." (SAC at 20.) Relator also alleges that Hektoen was reimbursed "[d]espite the falsity of the underlying claims." (*Id.* at 22.) These conclusory statements fall far short of the transaction-level detail required by Rule 9. *Caremark,* 496 F.3d at 742. Absent the who, what, when, where, and how for these alleged false claims, these examples cannot form the basis of an FCA claim.

Relator's allegations surrounding the administration of the H1N1 grant reimbursement provide greater detail on a potential false statement to the Government. According to Relator, on September 1, 2011, the County electronically certified and submitted to the CDC two Grant Allocation Expense Reports. (SAC at 10; Expense Rpt. 1, SAC, Ex. 1, Dkt. 58-1; Expense Rpt. 2, SAC, Ex. 2, Dkt. 58-2.) Rule 9 requires that Relator identify the

specific falsities found in these reports. *Berkowitz*, 896 F.3d at 841, Relator failed to meet this burden.

Relator cannot allege that the Allocation Expense Reports are entirely false. Relator alleges that the Allocation Expense Reports were prepared based on pre-performance estimates of the time County employees would spend on the H1N1 grant. (SAC at 12.) Relator alleges that because she never tracked her time dedicated to federal service, the preparation of these reports must have been generated by the Program Managers after the fact. (*Id.*) This logical leap is belied by Relator's admission that she does not have firsthand knowledge of how the reports were prepared. Relator's role in preparing the reports was ensuring that the salaries assigned to the employees reflected the County's records. (*Id.*) The SAC is devoid of allegations that Relator has firsthand knowledge of how the allocations were determined. Indeed, Relator alleges that "she never discussed with other DPH managers how individual employees apportioned their time" because it "was not part of the Finance Component's workflow." (*Id.* at 11.)

Relator's failure to adequately allege that the entire Allocation Expense Report is false would not be fatal if she identified particular line items in the report which she knows to be false. These allegations are also missing from the SAC. First, Relator has firsthand knowledge of her own time allocation. Relator

alleges that she did not track her time dedicate to federal service. (*Id.* 12.) Tellingly, Relator does not allege that her time allocation in the Allocation Expense Reports is false. The Court will not and cannot presume this necessary fact. Second, Relator alleges that the County "expensed the same federal services at different rates to the Government." (*Id.* at 13.) This conclusory statement says nothing about the veracity of any item in the Allocation Expense Report. Relator thus fails to even vaguely plead a false statement as to the rates charged for services, let alone the raise the sort of detailed allegations necessary under Rule 9. Consequently, the alleged line item falsities identified by the Relator fail to meet the exacting standards of Rule 9.

Even if the Court could court conclude that any part of the Allocation Expense Reports were false, a plaintiff must connect the alleged false statements to payments from the Government. *Peck v. CIT Bank, N.A.,* 2020 WL 6781799, at *6 (N.D. Ill. Nov. 18, 2020). Relator, however, does not allege the purpose for which the Allocation Expense Reports were submitted to the Government. Relator only alleges that the reports were submitted on September 1, 2011, "in support of" the H1N1 grants. (SAC at 10.) She later alleges that the Government reimbursed the County for its expenses in connection with the H1N1 grants on September 26, 2011. (*Id.* at 14.) Absent is a connection between the submission of the

Allocation Expense Reports and the reimbursement payment. Relator's "failure to connect the alleged fraud with specific money spent by the federal government renders [her] allegations inadequate under Rule 12(b)(6) and especially Rule 9(b)." *Peck,* 2020 WL 6781799, at *6.

The remainder of Relator's examples set forth alleged regulatory violations. (*See, e.g., id.* at 12–13, 21–22, 25.) But "it is not enough to allege, or even prove, that the [defendant] engaged in a practice that violated a federal regulation." *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.,* 772 F.3d 1102, 1107 (7th Cir. 2014). Indeed, "[v]iolating a regulation is not synonymous with filing a false claim." *Id.* at 1107. Instead Relator must plead a connection between these alleged regulatory breaches and the County making a false statement or claim to the Government in exchange for payment. *Id.* The SAC alleges no such facts.

The closest the SAC comes to alleging the necessary facts is the claim that, by reallocating restricted H1N1 grant funds to an unrestricted account, the County "undermined any truth to the budget and compliance certification" submitted to the CDC on September 1, 2011. (SAC at 16.) The SAC, however, provides no specific details regarding the terms of the September 1, 2011 certification or any certification signed by the County. *United*

*States ex rel. Yannacopoulos v. Gen. Dynamics,* 652 F.3d 818, 827–29 (7th Cir. 2011) (analyzing an FCA certification claim against the specific certifications made to the Government). Absent the terms, the Court has no basis on which to evaluate whether the County's conduct conflicted with the terms of any certification.

Also fatal to this theory is that to sustain an FCA claim based on certifications, the Relator must allege "that the [certified] statement was false at the time" it was made. *Grenadyor,* 772 F.3d at 1105. Relator, however, only pleads post-certification conduct that she alleges undermined the veracity the certifications. This after-the-fact conduct says nothing about the truth of the certifications on September 1, 2011 or any other date that a certification was submitted by the County. Accordingly, this example cannot support an FCA claim under subsections (A) or (B).

For these reasons, Relator has failed to allege the facts necessary to support FCA claims under Sections 3279(a)(1) subsections (A) and (B). Consequently, Counts I and II are dismissed for failure to state a claim.

### B. Improper Retention of Government Funds (Counts III and IV)

Counts III and IV allege that the County improperly retained Government funds. Count III alleges conversion of Government property in violation of Section 3729(a)(1)(D). Few Courts have

analyzed claims under this particular provision, but all prior precedents agree that in order to show a violation the Relator must allege that the County's "(1) possession, custody, or control of property used or to be used by the government; (2) delivery, or causing delivery, of less than all that property; and (3) knowledge of that inadequate delivery." *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.,* 842 F.3d 430, 438-39 (6th Cir. 2016). Count IV alleges a reverse false claim, and "requires Relator to allege that defendant had an existing, legal obligation to pay or transmit money or property to the government and that defendant submitted false statements or records to conceal, avoid, or decrease that obligation." *Besancon,* 2014 WL 4783056, at *4 (internal citations omitted). Relator has failed to allege sufficient facts supporting a claim that the County retained funds rightfully belonging to the United States Government in violation of the FCA.

Both conversion and a reverse false claim require the Relator to first establish that the County was in possession of funds that rightfully belong to the United States Government. 31 U.S.C. § 3729(a)(1)(D) (extending liability to a defendant that "has possession, custody, or control of property or money used, or to be used, by the Government"); *id.* § 3729(a)(1)(G) (extending liability to a defendant that has an "obligation to pay or transmit

money or property to the Government"). The SAC includes no such allegations.

Relator alleges that restricted H1N1 grant funds were reallocated to an unrestricted account. (SAC at 16.) Relator similarly alleges that the County reallocated $6.8 million from WIC grants to CCHHS. (*Id.* at 19.) According to Relator, these reallocations rise to the level of an FCA violation because the County was obligated to refund unused grant balances to the Government in accordance with its grant closeout processes. (Oppn. at 9, Dkt. No. 64.) But the Relator failed to plead any details about these close-out procedures, thereby establishing that these funds were actually due back to the Government. The SAC is silent as to who conducts the process, what outcomes trigger an obligation to repay grant funds, when the County knew it was in possession of unused grant funds, or how unused funds are returned. Absent allegations detailing the close-out processes in connection with Relator's examples, there is no basis for the Court to determine whether any grants funds were indeed due back to the Government and that the County knew it was required to return such funds.

Finally, the Relator fails to plead any allegations suggesting that the alleged reclassifications were done with the intention of defrauding the government. *Grenadyor,* 772 F.3d at 1108 (dismissing an FCA claim where, among other things, the

relator did not allege that the defendants acted "with the intention of defrauding the government"). Relator pleads no facts regarding the intent of the County with respect to the reclassified H1N1 funds. Consequently, the Court has no basis to conclude that this action was meant to avoid repayment or that it caused the County to deliver less than what was owed to the Government. As to the WIC funds, Relator provides some insight into the intent of the County, alleging that the County believed the $6.8M was being transferred to CCHHS for WIC costs the hospital system absorbed. (SAC at 19.) Relator alleges that she disagreed. (*Id.*) But she provides no allegations or evidence beyond that facial disagreement that evidences the County knew CCHHS had not absorbed any WIC costs and reclassified the funds to obscure that fact.

For these reasons, Relator has failed to allege the facts necessary to support FCA claims under Sections 3279(a)(1) subsections (D) and (G). Consequently, Counts III and IV are dismissed for failure to state a claim.

### C. Dismissal with Prejudice

"Despite receiving express directions about what they had to do, counsel did not do it. At some point the train of opportunities ends." *Guaranty Nat'l Title Co. v. J.E.G. Assocs.,* 101 F.3d 57, 59 (7th Cir.1996) (citation omitted). Relator has had two opportunities to amend her complaint, once with the benefit of the

Court's detailed opinion explaining the FAC's deficiencies. Even with this roadmap, the SAC makes the same mistakes and fails to state a claim that complies with the Federal Rules of Civil Procedure. The deficiencies in the SAC are not small and provide this Court with no indication that Relator may be able to adequately plead an FCA claim in the future. Therefore, this dismissal is with prejudice.

### IV. <u>CONCLUSION</u>

For the reasons stated herein, Defendant's motion to dismiss Relator's second amended complaint is granted with prejudice. (Dkt. No. 61.)

**IT IS SO ORDERED.**


_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 4/29/2021